IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUOZAS V.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 20 C 3692 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[2] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[3]

Plaintiff Juozas V. applied for Disability Insurance Benefits ("DIB") in 2013, claiming he became disabled on June 1, 2009 due to degenerative disc disease in his lumbar spine, although he continued to work three days a week as a receptionist until March 2012. (R. 191, 223, 1550.) An Administrative Law Judge ("ALJ") denied Plaintiff's application in January 2015 (R. 9); that decision was ultimately appealed to the district court, and the Commissioner agreed to remand the case. (R. 705-10.) On remand, Plaintiff submitted evidence that he had anxiety and depression in addition to lumbar spine issues. (*See, e.g.*, R. 629-31, 801-23.) In December 2017, the ALJ issued

---

[1] Plaintiff's surname has been omitted from this opinion in compliance with the Court's Internal Operating Procedure No. 22.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On August 31, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to Magistrate Judge Cox for all proceedings, including entry of final judgment. (D.E. 12.) On March 22, 2022, the Executive Committee reassigned the case to this Court pursuant to Local Rule 40.3(c), as this Court presided over an earlier case involving this Plaintiff (18-2044).

a second opinion denying benefits, finding Plaintiff was not disabled through his date last insured ("DLI") of September 30, 2015.[4] (R. 600-20.)

In September 2019, on appeal to this Court, we ordered remand based on one issue: the ALJ had found Plaintiff had moderate limitations in concentration, persistence, or pace, but failed to account for those limitations in the residual functional capacity ("RFC"). (R. 1313-15.) The Appeals Council ("AC") subsequently vacated the ALJ's decision and without further explanation, remanded the case to a new ALJ "for further proceedings consistent with the order of the court." (R. 1318.) While the case was pending, Plaintiff filed an application for Supplemental Security Income ("SSI") (disability benefits that do not depend on a DLI), alleging that on July 1, 2017, he became disabled based on thoracic outlet syndrome,[5] in addition to back pain, anxiety and depression. (R. 1512, 1553.) The new ALJ consolidated Plaintiff's applications and held another hearing, and in March 2020, issued an opinion concluding Plaintiff was not disabled under the Social Security Act. (R. 1118.) Plaintiff did not file exceptions to the opinion, and the AC did not assume jurisdiction, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.984(d). Plaintiff has now appealed to this Court seeking reversal of the latest ALJ opinion (D.E. 18), and the Commissioner has filed a motion to affirm (D.E. 24).

I.      **The ALJ's March 2020 Opinion**

The Court begins with the ALJ's opinion that is under review, which provides a thorough discussion and analysis of the evidence in the record. With regard to Plaintiff's mental

---

[4] To be entitled to DIB, a claimant must establish disability on or before their DLI. *Mandrell v. Kijakazi*, 25 F.4th 514, 515 (7th Cir. 2022).

[5] "Thoracic outlet syndrome is a group of disorders that occur when blood vessels or nerves in the space between the collarbone and first rib are compressed, causing shoulder and neck pain and numbness in the fingers." https://www.mayoclinic.org/diseases-conditions/thoracic-outlet-syndrome/symptoms-causes/syc-20353988#:~:text=Thoracic%20outlet%20syndrome%20(TOS)%20is,and%20numbness%20in%20your%20fingers.

impairments, the ALJ discussed this Court's September 2019 remand order but explained that after reviewing the evidence, she had determined that Plaintiff did not have a severe mental impairment that resulted in any functional limitations. (R. 1117.) The ALJ first examined the evidence prior to Plaintiff's DLI, and concluded that other than taking medication, Plaintiff underwent "minimal treatment for his mental health symptoms," was able "to improve his mood using non-medication methods including online support groups," and had "relatively normal mental status exams." (R. 1121-22.) The ALJ then reviewed the post-2015 evidence and determined that Plaintiff's condition "had not changed significantly by the time he filed" for SSI in the second half of 2018. (R. 1122.)

Next, the ALJ examined Plaintiff's mental health treatment at the time of his SSI application and determined that "the mental status examinations and cognitive testing during this period document generally normal mental status exams and positive response to treatment," and medical records noted no limitations in attention and concentration. (R. 1123-24.) The ALJ concluded that Plaintiff's mental impairments were non-severe and caused only mild limitation in the paragraph B functional areas (understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself). (*Id*.) The ALJ noted that in February 2019, Plaintiff's therapist indicated Plaintiff "had demonstrated significant progress," and in March 2019, neuropsychological testing revealed Plaintiff had average intellectual functioning (despite taking the test in English, which was his second language) and only mild difficulties in attention, memory, depression and anxiety, despite Plaintiff not taking any psychotropic medication. (R. 1122-23.) In April 2019, Plaintiff told his neurologist that he had panic attacks when leaving the house ever since he discontinued Klonopin (a sedative) due to side effects in 2015; however, the ALJ pointed out that in September 2019, he told his psychiatrist that he had not had a panic attack in months, and his mental status exam was

normal. (R. 1123-24.) Moreover, the ALJ noted that Plaintiff went to the gym on a regular basis, took care of his elderly parents, and occasionally babysat his niece and nephew. (R. 1124.) The ALJ acknowledged that Plaintiff performed worse at a December 2019 neuropsychological exam but noted that the examiner attributed this to Plaintiff's anxiety and lack of sleep. (*Id*.)

The ALJ gave great weight to the non-examining state agency mental consultants, who opined in 2013 and 2018 that Plaintiff had a nonsevere mental impairment. (R. 1125.) In the 2013 opinions, the consultants emphasized that Plaintiff's anxiety was secondary to his back pain, and in 2018, the consultants noted that Plaintiff drove a car, went shopping alone, attended church weekly and frequently went to the gym. (*Id*.) The ALJ found these opinions were supported by the medical record, including later records from 2019. (*Id.*)

By contrast, the ALJ gave little weight to the March 2014 opinion from treating psychiatrist Alessandra Tachauer, M.D., and the January 2019 opinion from treating therapist, Vince Hennenberg, LSW. (*Id*.) The ALJ explained that Dr. Tachauer's opinion was "inconsistent internally and with the records in the file at this time." (*Id*.) Likewise, the ALJ found Mr. Hennenberg's opinion that Plaintiff had marked social limitations was internally inconsistent, not supported in Mr. Hennenberg's treatment notes, and inconsistent with the record, which showed that Plaintiff attended medical appointments, therapy, and physical therapy ("PT") regularly. (R. 1125-26.) The ALJ also gave little weight to the February 2020 mental impairment questionnaire filled out by psychiatrist Dhruthi Kalangi, M.D., who assessed Plaintiff as being seriously limited in interacting with others, memory, concentration, and adapting and managing oneself; the ALJ found that assessment inconsistent with the records from this period, including notes from Plaintiff's counselor indicating Plaintiff went to the gym daily, enjoyed reading, concerts and cooking, occasionally went out with his friends, and appeared neat and well-groomed. (R. 1126.)

With regard to physical impairments, the ALJ found Plaintiff had severe lumbar degenerative disc disease, thoracic outlet syndrome and cubital tunnel syndrome,[6] but that these impairments did not meet or medically equal a listing. (R. 1120.) The ALJ assigned Plaintiff an RFC to perform light work except Plaintiff could occasionally climb; frequently but not constantly crawl, crouch, kneel, stoop and balance; and frequently but not constantly handle, finger, and feel bilaterally. (R. 1126-27.) The ALJ arrived at this RFC after examining evidence of Plaintiff's physical impairments from 2013 through 2020, and determining that Plaintiff's statements about the intensity, persistence, and limiting effects of his pain were inconsistent with: (1) his treatment, which the ALJ found to be generally "routine and conservative;" (2) his physically active lifestyle; and (3) medical examinations and imaging showing only mild findings. (R. 1128.)

The ALJ noted that despite pursuing only "conservative treatment," Plaintiff "has yet to display significant functional deficits" and has remained physically active, attending the gym up to seven days a week, including using the elliptical and lifting weights. (R. 1128, 1133, 1136.) The ALJ determined that "the bulk of [Plaintiff's] complaints appear to be related to acute exacerbations due to overexertion at the gym, at home, or in other settings such as engaging in heavy lifting, doing exercises that were too intense, or accidentally dropping . . . or running into things," and shoveling snow. (R. 1132, 1136.) The ALJ found that objective testing of Plaintiff's low back was consistent with this level of activity: lumbar MRIs consistently revealed only mild degenerative findings with no stenosis, and physical exams documented few abnormalities. (R. 1128-30.) The ALJ noted that in 2017, Plaintiff's therapist wondered how Plaintiff's pain affected him because he was going to the gym "as often as possible," and his appearance and grooming

---

[6] "Cubital tunnel syndrome happens when the ulnar nerve, which passes through the inside of the elbow, becomes inflamed and irritated. https://www.hopkinsmedicine.org/health/conditions-and-diseases/cubital-tunnel-syndrome#:~:text=What%20is%20cubital%20tunnel%20syndrome,inflamed%2C%20swollen%2C%20and%20irritated.

5

were much better than might be expected from someone in debilitating pain. (R. 1130.) The ALJ acknowledged that Plaintiff complained of low back pain in 2018 but noted that lumbar spine imaging continued to show mild findings and an orthopedist prescribed only anti-inflammatories and PT. (R. 1130-31.) Plaintiff also complained of low back pain in 2019 after using dumbbells and a rowing machine, but his physical exam was normal; he was prescribed a muscle relaxant and home PT and instructed to avoid intensive lower back exercises. (R. 1131.) Imaging showed Plaintiff's "degenerative disc disease was generally stable, [and] only mildly increased . . . at L1-L2." (*Id*.) In January 2020, Plaintiff's orthopedist again found imaging of Plaintiff's low back was "unremarkable," and Plaintiff's physical exam was normal. (R. 1132.)

The ALJ also acknowledged Plaintiff reported that his symptoms of shoulder pain, upper extremity numbness and chest pain from his thoracic outlet syndrome worsened in 2018. (R. 1124, 1128, 1133, 1136.) However, the ALJ noted that Plaintiff demonstrated better than average cardiac function for his age group, and he continued going to the gym and remained physically active. (*Id*.) Moreover, Plaintiff did not attempt rib resection surgery despite being referred by various providers over the course of two to three years as the best option to help his upper body symptoms. (*Id*.) Instead, Plaintiff underwent specialized PT, pain management, and Botox injections, after which Plaintiff reported "significant improvement." (R. 1133-34.) In the second half of 2018, imaging confirmed Plaintiff's thoracic outlet syndrome had worsened, and Plaintiff's thoracic surgeon Andrew Arndt, M.D., again encouraged Plaintiff to undergo surgery. (R. 1134-35.) In February 2020, orthopedic surgeon Grant Garrigues, M.D., also recommended surgery to address Plaintiff's arm pain and numbness, but Plaintiff did not pursue surgical options. (R. 1135.)

The ALJ gave little weight to Dr. Arndt's February 2020 RFC opinions. The ALJ found them internally inconsistent, as Dr. Arndt opined Plaintiff could not sit for more than 20 minutes

6

at a time or stand at all, yet he could sit, stand and walk for six hours in an eight-hour day. (R. 1137.) In addition, the ALJ found Dr. Arndt's opinion that Plaintiff's upper extremity issues would interfere with his concentration frequently and limit him to handling and fingering up to 50% of the time and reaching up to 25% of the time was inconsistent with Plaintiff exercising up to seven days a week. (*Id.*) By contrast, the ALJ gave great weight to the opinions of the non-examining state agency medical consultants, who opined that Plaintiff could do light work with occasional climbing of ladders, ropes, and scaffolds and frequent stooping, crouching, crawling, handling, fingering and feeling. (R. 1136.) The ALJ determined that the manipulative limitations adequately accounted for Plaintiff's upper extremity symptoms despite his testimony that he had difficulty typing, because he did upper body workouts (although working out too intensely exacerbated his symptoms) and he had done temporary work involving typing. (R. 1135-36.) In addition, the ALJ found that the postural limitations were consistent with Plaintiff's testimony about what he could lift and evidence that his lower back pain worsened when he worked out too intensely. (R. 1136.)

**II.     Analysis**

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted). The Court rejects Plaintiff's arguments for remand for the reasons set forth below.

7

### A. The ALJ Did Not Violate the "Law of the Case" Doctrine.

Initially, Plaintiff contends that the ALJ's 2020 decision violated the law of the case as set forth in this Court's September 2019 order reversing and remanding the December 2017 ALJ decision. (D.E. 18: Pl.'s Br. at 4-6.) According to the law of the case doctrine, the ALJ must conform its proceedings on remand to the issues decided "expressly or by necessary implication" by the reviewing court. *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020) (citations and quotations omitted). "For the law of the case doctrine to come into play, the court must have first determined the particular issue, as an actual decision of an issue is required to establish the law of the case. If an issue is left open after remand, the lower tribunal is free to decide it." *Id*. (internal citations and quotations omitted).

Plaintiff contends that this Court came to "the clear conclusion" that he had "moderate concentration limitations which had to be adequately accommodated," so that the ALJ's determination that he had only mild mental limitations, and no related functional limitations in the RFC, violated the law of the case. (Pl.'s Br. at 6.) This argument misconstrues the plain language of the September 2019 order. The Court explained that *because* the prior ALJ had "expressly" found Plaintiff had moderate limitations in concentration, persistence or pace, "she was required to account for it in formulating Plaintiff's RFC," but the ALJ had not done so. (R. 1312-15.)[7] In his reply, Plaintiff alternatively argues that this Court made an "implicit finding" that he had moderate limitations, which the ALJ was bound to follow on remand. (D.E. 30: Pl.'s Reply at 4.) However, this Court made no finding, explicitly or implicitly, on the severity of Plaintiff's mental impairments. We held only that once the ALJ determined the severity of Plaintiff's mental

---

[7] The ALJ had assigned Plaintiff an RFC limited to "simple, routine, repetitive tasks" and "understand[ing], remember[ing], and carry[ing] out simple instructions," which the Seventh Circuit has expressly held does not, by itself, adequately address limitations in concentration, persistence, or pace. (R. 1314-15, citing *Winsted v. Berryhill*, 923 F.3d 472 (7th Cir. 2019), and *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019)).

impairments, the ALJ had to account for that determination in the RFC. Thus, in this case as in *Surprise*, the new ALJ upon remand did not violate the law of the case by declining to adopt limitations in the first ALJ's opinion, because the district court did not make any factual findings as to the claimant's limitations or impairments in its remand order. 968 F.3d at 659, 661.

Plaintiff also argues that the new ALJ violated the law of the case by reaching a new conclusion based on "the same" or "basically the same evidence as the prior ALJ had," without explaining why the prior ALJ's assessment was erroneous. (Pl.'s Reply at 2, 4.) To the contrary, the new ALJ had to consider Plaintiff's new SSI claim and almost 2,000 additional pages of record, and the ALJ thoroughly explained each of her conclusions in the opinion. Regardless, because this Court's September 2019 Order did not make any factual or legal determinations regarding the first ALJ's assessment of the nature or extent of Plaintiff's mental health symptoms, the newly assigned ALJ "was free to reassess" them on remand without violating the law of the case doctrine. *Surprise*, 968 F.3d at 663, citing *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). As Magistrate Judge Cole stated in *Thelmarae W. v. Saul*:

> The law of the case doctrine requires an administrative agency to conform its further proceedings in the case to the principles set forth in the appellate decision. It did so. There was no violation of the law of the case doctrine. The ALJ was not ordered to find a severe mental impairment or find the plaintiff had a disability. The ALJ did as she was instructed. It just didn't go the way the plaintiff had wanted.

476 F. Supp. 3d 717, 730 (N.D. Ill. 2020) (internal citations and quotations omitted).

### B. The ALJ's Decision Not to Include Mental Limitations in Plaintiff's RFC Was Supported By Substantial Evidence.

Plaintiff argues that even if the ALJ's determination that he had mild mental limitations was supported by substantial evidence, the ALJ erred by omitting mental restrictions from his RFC because ALJs must consider limitations imposed by all of an individual's impairments, even those that are not severe, in assessing an individual's RFC. (Pl.'s Br. at 7, citing SSR 96-8p.) However,

9

as this Court's discussion of the ALJ's opinion shows, the ALJ did examine the evidence of Plaintiff's mental impairments at length, both evidence tending to support and undermine Plaintiff's claimed limitations and determined that "the balance of the evidence" showed that Plaintiff's mild mental impairments did not further limit Plaintiff's ability to do basic work activities in the RFC. *Bakke v. Kijakazi*, – F.4th –, 2023 WL 2473109, at *4 (7th Cir. Mar. 13, 2023). "This explicit weighing is precisely within the purview of the ALJ—and it is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome." *Id*.

Moreover, Plaintiff "has not pointed to any medical opinion or evidence to show any [mental impairments] caused any specific limitations." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021). Plaintiff contends that the ALJ should have explained why his impairments would not result in time off task since the VE opined that allowable off-task time could not exceed 15% of the workday. (Pl.'s Br. at 9.) But the VE testified as to a hypothetical individual. It was Plaintiff's burden to show that his impairments would keep him off task, and the ALJ did not find any such limitations supported by the evidence. Thus, the ALJ's decision that Plaintiff had mild mental impairments that did not require limitations in his RFC was supported by substantial evidence.

    **C.**    **The ALJ's Assessment of Plaintiff's Doctors' RFC Opinions Was Supported By Substantial Evidence.**

Plaintiff next contends that the ALJ's decision to give little weight to the opinion of treating psychiatrists Dr. Tachauer in 2014 and Dr. Kalangi in 2020 and treating therapist Mr. Henneberg in 2019, while giving great weight to the opinions of the non-examining State agency reviewing mental consultants, "did not comport with 20 C.F.R. 404.1527(c)" and was not supported by substantial evidence. (Pl.'s Br. at 11-12.) First, a point of clarification. Section 404.1527(c) applies to claims filed before March 27, 2017, and thus applies only to Plaintiff's DIB claim. This section contains the so-called "treating source rule," which provides that the ALJ will "[g]enerally . . .

10

give more weight to medical opinions from . . . treating sources." *Id*. at 404.1427(c)(2). If a treating source's medical opinion as to the nature and severity of a claimant's impairments is "well-supported" and "not inconsistent with the other substantial evidence," the ALJ "will give it controlling weight," but if the treating source's opinion is not given controlling weight, the ALJ must "give good reasons" and consider factors including length, nature, extent and frequency of the treating relationship, the supportability and consistency of the physician's opinion, and the physician's specialization. *Id*. For claims filed after March 27, 2017, such as Plaintiff's SSI claim, the treating source rule does not apply, and the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). "The most important factors" for the ALJ to consider are the "supportability" of the opinion in the medical source's explanation and notes and its "consistency" with other evidence in the record. *Id*. at § 404.1520c(b)(2), (c).

Under either regulation, the ALJ's determination here was supported by substantial evidence. Plaintiff contends that the ALJ "fail[ed] to explain why the consistent opinions of two treating psychiatrists and a treating therapist" (in that they all opined Plaintiff had marked social limitations) "were not entitled to greater weight than the opinions of the non-examining State agency psychologists." (Pl.'s Br. at 12.) Contrary to Plaintiff's allegations, the ALJ's analysis was thorough and built the necessary logical bridge between the evidence and her conclusions. The ALJ explained that the opinions of Plaintiff's treating mental health professionals were internally inconsistent, unsupported by their own treatment notes, and inconsistent with other evidence in the record. Even under the treating source rule, the treater's medical opinion must be "well-supported" and "not inconsistent with the other substantial evidence" before it will be given controlling weight. The ALJ thus did "not err in choosing to discount [the treating physician's]

11

opinions and credit the state agency physicians' conclusions" because "the ALJ examined [the treating physician's] medical opinions for consistency with the record and internal supportability and found them lacking, articulating each of those analyses in his opinion." *Bakke*, 2023 WL 2473109, at *5.

Plaintiff also argues that the "specific reasons [given by the ALJ] for discounting [his] treating psychiatrists' opinions are not supported by substantial evidence." (Pl.'s Br. at 12.) The "specific reasons" Plaintiff points to are his ability to perform "basic daily activities" and to "passively watch children with assistance from another adult," his enjoyment of nature, music, and concerts, and the fact that he "was neat and well-groomed upon two occasions." (*Id*.) However, Plaintiff's focus on these activities not only ignores the ALJ's explanation regarding the lack of consistency and supportability in the psychiatrists' opinions, but it also ignores the ALJ's far heavier reliance on Plaintiff's ability to take care of his elderly parents and to work out frequently, even daily, at the gym. "When [Plaintiff] criticizes the ALJ's analysis of [his] daily functioning, . . . []he is, as above, inviting us to reweigh the evidence. But when assessing an ALJ's credibility determination, . . . we merely examine whether the ALJ's determination was reasoned and supported." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022) (internal citations and quotations omitted). Plaintiff's selective reading of the ALJ's opinion notwithstanding, the Court finds that the ALJ's determination was reasoned and supported by substantial evidence, and we "decline [Plaintiff's] offer to substitute our judgment for that of the ALJ's." *Id*. at 279-80.

Plaintiff also contends that the ALJ erred in giving great weight to the 2013 and 2018 opinions of the non-examining State agency consultants because they "could not have listened to and factored in [Plaintiff's] testimony" or the March 2019 neuropsychological opinion. (Pl.'s Reply at 5.) However, the ALJ reviewed Plaintiff's testimony and considered the evidence from

12

2019 and 2020 and determined that the state agency opinions were supported by the medical record, including later records from 2019. (R. 1125.) In other words, the ALJ weighed all the evidence, both evidence tending to support and undermine Plaintiff's allegations, and determined that "the balance of the evidence" showed that the opinions of state agency physicians were more reliable that those of Plaintiff's treating physicians. *See Bakke*, 2023 WL 2473109, at *4. Thus, the ALJ's decision was supported by substantial evidence.

> **D. The ALJ's Determination at Steps 4 and 5 as to the Jobs Available to an Individual with Plaintiff's Manipulative Limitations Was Supported by Substantial Evidence.**

Lastly, Plaintiff takes issue with the ALJ's determination that he could "frequently" handle, finger and feel (*i.e.*, perform fine manipulation). (Pl.'s Br. at 13-14.) The ALJ gave great weight to the opinions of the non-examining state agency consultants, who opined that Plaintiff could perform frequent handling, fingering and feeling (R. 1136), and the ALJ gave little weight to Dr. Arndt's RFC opinion which limited Plaintiff to handling and fingering up to 50 percent of the workday. (R. 1137.) Contrary to Plaintiff's arguments, the ALJ explained in detail why she gave little weight to Dr. Arndt's opinion and great weight to the state agency opinions. The ALJ determined that Dr. Arndt's opinion was internally inconsistent and inconsistent with evidence that Plaintiff did upper body workouts and temporary work involving typing, while the manipulative limitations in the state agency opinions adequately accounted for Plaintiff's upper extremity symptoms. (R. 1135-37.) Therefore, the ALJ's decision to give great weight to the state agency opinions and little weight to Dr. Arndt's opinion was supported by substantial evidence, and we will not reweigh the evidence.

Nevertheless, Plaintiff contends that the "ALJ erred by failing to address the specific percentage of time [he] could handle and finger," because the vocational expert ("VE") testified

13

that an individual who could not use their hands more than 50 percent of the time for handling, fingering and feeling (in addition to the other limitations laid out by the ALJ) could not perform any work. (Pl.'s Br. at 13-14.) By contrast, under the Social Security Regulations, the ALJ's determination that Plaintiff had the RFC to "frequently" handle, finger and feel means that he could perform fine manipulation from one-third to two-thirds (or 33 to 67 percent) of the workday. SSR 83-10.

While the VE's testimony was far from a model of clarity, both the VE's and the ALJ's intended meanings were clear, and the ALJ's Steps 4 and 5 determinations were supported by substantial evidence. To put it simply, the VE testified that Plaintiff's past relevant work and a significant number of other jobs in the national economy were available for an individual who could perform fine manipulation at least 50 percent of the workday. (R. 1188-89.) The ALJ determined that Plaintiff was able to perform fine manipulation 33 to 67 percent of the workday, and the ALJ relied on the VE's testimony in concluding that Plaintiff could perform her past relevant work and a significant number of other jobs in the national economy. (R. 1138-39.) The ALJ's decision was supported by substantial evidence because the jobs cited by the VE would necessarily be included within Plaintiff's RFC to handle, finger and feel 33 to 67 percent of the workday.

14

## CONCLUSION

For these reasons, the Court rejects Plaintiff's brief in support of remand (D.E. 18) and grants Defendant's motion for summary judgment (D.E. 24.)

**ENTER:**

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: March 27, 2023**